

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-20-2001

# Szuchon v. Lehman

Precedential or Non-Precedential:

Docket 00-9000

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Szuchon v. Lehman" (2001). *2001 Decisions.* Paper 271.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/271

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 20, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-9000 and 00-9001

JOSEPH SZUCHON,
        Appellee/Cross-Appellant

v.

JOSEPH LEHMAN, Commissioner; ANDREW DOMOVICH,
Warden, State Correction Institution at Pittsburgh;
PENNSYLVANIA DEPARTMENT OF CORRECTIONS,
        Appellants/Cross-Appellees

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 94-cv-00195E)
District Judge: Honorable William L. Standish

Argued May 24, 2001

Before: RENDELL, GREENBERG and COWEN,
Circuit Judges.

(Filed: November 20, 2001)

        Amy Zapp, Esq. [ARGUED]
        Office of Attorney General of
         Pennsylvania
        Department of Justice
        Strawberry Square, 15th Floor
        Harrisburg, PA 17120

         Counsel for Appellants/Cross
        Appellees

Caroline M. Roberto, Esq. [ARGUED]
1600 Law & Finance Building,
 5th Floor
Pittsburgh, PA 15219

   –and–

Lynn A. Ellenberger, Esq.
1330 West Huron Street, Suite 2
Chicago, IL 60622

 Counsel for Appellee/Cross-
Appellant

OPINION OF THE COURT

RENDELL, Circuit Judge.

We are asked to review the District Court's order granting in part and denying in part Joseph Szuchon's petition for a writ of habeas corpus pursuant to 28 U.S.C. S 2254. A Pennsylvania jury convicted Szuchon of first-degree murder of his former girlfriend, Judy Snyder, during a nighttime rampage which we describe in detail below. The jury then sentenced him to death. Szuchon asserted numerous claims of error in his habeas petition in connection with both the trial and sentencing.

The District Court denied relief on all trial phase claims, and Szuchon cross-appeals from that judgment. For the reasons set forth below, we will grant Szuchon a certificate of appealability for his claims regarding the admission of certain psychiatric evidence in violation of Estelle v. Smith, 451 U.S. 454 (1981), but we will affirm the District Court's denial of relief. A certificate of appealability will be denied on the remaining trial phase claims.

As to the sentencing phase, the District Court held that the jury instructions regarding the mitigating circumstances violated the holding of Mills v. Maryland, 486 U.S. 367 (1988), and it granted the writ on the condition that the state court conduct a new sentencing proceeding or impose a term of life imprisonment. The Commonwealth appeals, arguing, inter alia, that the Mills

claim is procedurally defaulted because Szuchon failed to exhaust his Mills claim in state court, and state remedies are now foreclosed. Although we conclude that the Commonwealth may have waived this defense by failing to raise it in its answer to the habeas petition, we will address the question of whether the claim is procedurally defaulted. We conclude that the Mills claim is defaulted and barred from review on the merits given Szuchon's inability to show cause or a fundamental miscarriage of justice. Consequently, Szuchon cannot pursue habeas relief based on Mills. Szuchon, however, also cross-appeals from the denial of his remaining sentencing claims, one of which was that the state court improperly permitted the exclusion at voir dire of six prospective jurors who merely voiced opposition to the death penalty. We hold that the exclusion of the prospective jurors violated Szuchon's Sixth and Fourteenth Amendments rights under Witherspoon v. Illinois, 391 U.S. 510 (1968), and Wainwright v. Witt, 469 U.S. 412 (1985), and thus a new sentencing is required. Accordingly, we will affirm, on other grounds, the District Court's decision to grant the writ in connection with Szuchon's sentencing.

I. BACKGROUND

We borrow the factual recitation from one of the Pennsylvania Supreme Court's opinions in this matter:

> The events culminating in an evening of terror on April 14, 1981 for three young people in Erie County began with the breakdown of [Szuchon]'s relationship with Judy Lynn Snyder and his inability to deal with that breakdown. [Szuchon] and Ms. Snyder had been involved in a stormy relationship over a period of several years, including periods of time in which they lived together in California and in Philadelphia. Toward the end of 1980, Ms. Snyder left [Szuchon] in Philadelphia and returned to her parents' home in Erie.
>
> Refusing to accept that the relationship was over, [Szuchon] began to harass Ms. Snyder with telephone calls at her parents' home. [Szuchon]'s love for Judy Snyder progressively transformed to hatred and he

began to tell various people how he was going to kill her with a Winchester rifle or cut her from ear to ear -- if he could not have her, no one would. Eventually, [Szuchon] returned to Erie to pursue Ms. Snyder.

In Erie, [Szuchon] continued to harass Judy Snyder at her parents' home, with Erie police being dispatched to the home on two occasions to remove [Szuchon] from the premises. [Szuchon] also continued to tell others that he intended to kill Ms. Snyder as well as her "boyfriend." Finally, on April 14, 1981, [Szuchon] purchased a Winchester rifle from Gorenflo's Gunsmith in Erie, purchased bullets from the Erie Sport Store, loaded the rifle and drove to the Bottom Line, a restaurant/tavern where Judy Snyder was working.

[Szuchon] parked in the lot of the Bottom Line and read a newspaper while he waited for Ms. Snyder to get off work. When her shift was finished, she and two friends, Aldo DeSanto and Mary Sadowski, left the Bottom Line to go to Judy's car, whereupon the three were confronted by [Szuchon], holding the Winchester and stating "If you all don't get into the car, I'll blow your fucking heads off.". . . All four then got in Ms. Snyder's car with Judy driving, Mary in the front passenger seat, and Aldo in the back seat with [Szuchon].

[Szuchon] then directed Ms. Snyder to drive to an isolated area, the state game lands. As they drove, [Szuchon] kept the gun pointed at them and, at one point, told the three to "make your act of contrition or say your confessions if you want to go to heaven because at the end of this night I'm surely going to hell." . . . Mary Sadowski, certain she was going to die at [Szuchon]'s hands, jumped from the moving car (at 50 m.p.h.) and escaped. . . . Somehow she avoided serious injury, ran to a house and called the police.

[Szuchon] ordered Ms. Snyder to continue to drive to the game lands. Upon arrival there (the drive took approximately 15-20 minutes), he ordered her and Mr. DeSanto to walk into a corn field. The latter took several steps into the field, but Ms. Snyder refused.

4

When she persisted in refusing to go on, [Szuchon] aimed the gun at Ms. Snyder, she turned, and [Szuchon] shot her in the back. Mr. DeSanto jumped to the ground, rolled, then got up and ran. While running, he heard two more shots. He finally reached a farmhouse and the owners called the police.

Shortly thereafter, Pennsylvania State Troopers arrived at the scene and discovered Ms. Snyder's abandoned car, and then located her body. She had been killed by two bullets that had pierced her back from different angles. [Szuchon] was nowhere to be found, and a police manhunt was initiated.

Later that evening, Frederick Pusch was driving his vehicle on an isolated road south of Erie when he encountered [Szuchon] who informed Mr. Pusch that his car had broken down and that he needed to use a phone. Mr. Pusch drove [Szuchon] to Pusch's cottage at Canadohta Lake. While at the cottage, [Szuchon] informed Mr. Pusch that he had just killed his girlfriend and that another girl and a guy had gotten away. The next morning (April 15th), [Szuchon] placed a message with the Erie Police Department requesting that an officer with whom he was acquainted, Detective Richard Runstedler, come to Canadohta Lake so that he could turn himself in. Detective Runstedler and another officer drove to Canadohta Lake and took [Szuchon] into their custody at approximately 12:15 p.m. on April 15, 1981.

. . . [Szuchon] was taken to the state police barracks where he was given his Miranda warnings, which he waived. [Szuchon] then confessed to kidnaping the three victims at gunpoint, intending to take them to the country to kill them. [Szuchon] stated that he intended to kill them because Judy would not return to him as his girlfriend, and because he perceived Aldo as "cutting in on him" and felt that Mary was meddling and interfering with his relationship with Judy. [Szuchon]'s version of the events was essentially consistent with the testimony of the two kidnap victims. [Szuchon] told Trooper Povlick that he told Ms. Snyder "how much he loved her, and at this point she

5

laughed and turned her back and he shot her." . ..
[Szuchon] also informed Trooper Povlick that he had,
the day of the homicide/kidnaping, ingested a "couple
lines" of cocaine and "five to six quaalude tablets."
. . . No evidence of drugs or paraphernalia were found
on [Szuchon].

Commonwealth v. Szuchon, 484 A.2d 1365, 1368-69 (Pa.
1984).

In October 1981, a jury in the Court of Common Pleas for
Erie County convicted Szuchon of first-degree murder,
three counts of kidnaping, two counts of terroristic threats,
and two counts of reckless endangerment. The jury
acquitted Szuchon on a charge of attempted murder of Aldo
DeSanto. A sentencing proceeding was conducted before
the same jury shortly after the verdict. Neither the
Commonwealth nor Szuchon introduced new evidence at
sentencing. The Commonwealth argued the existence of two
statutory aggravating circumstances: Szuchon committed
the killing while in perpetration of a felony (kidnaping), and
he knowingly created a grave risk of death to individuals
(DeSanto and Sadowski) other than the murder victim. See
42 Pa. Cons. Stat. SS 9711(d)(6) and (7). Szuchon argued
four mitigating circumstances: although he pled guilty to a
robbery charge in 1974, he had no "significant history" of
prior convictions; he was under the influence of extreme
mental or emotional disturbance; his capacity to appreciate
the criminality of his conduct or to conform his conduct to
the requirements of law was substantially impaired; and
"other evidence of mitigation"-- namely, that he "was
substantially involved in the usage and abuse of drugs and
alcohol for a long period of time." Appendix ("App.") 3156;
see SS 9711(e)(1), (2), (3), and (8). The jury found both of the
aggravating circumstances and certain of the mitigating
circumstances to exist, and it concluded that the mitigating
circumstances were outweighed. Consequently, it imposed
a sentence of death on the first-degree murder conviction.1
See S 9711(c)(iv). The trial court denied Szuchon's motion
for a new trial, and the Pennsylvania Supreme Court

---

1. Szuchon received consecutive terms of incarceration on the other
convictions.

6

affirmed the convictions and sentences on direct appeal. Commonwealth v. Szuchon, 484 A.2d 1365 (Pa. 1984).

At trial, Szuchon had not denied that he committed the murder but presented a diminished-capacity defense, "which entails the assertion that the defendant's mental condition at the time of the offense was such that he was incapable of forming the specific intent to kill." Commonwealth v. Williams, 732 A.2d 1167, 1190 (Pa. 1999) (citing Commonwealth v. Zettlemoyer, 454 A.2d 937, 943 (Pa. 1982)).2 Szuchon tried to show, through testimony from the prosecution's witnesses, that he had ingested cocaine and sedatives on the date of the murder, resulting in a diminished capacity. The Pennsylvania Supreme Court aptly rendered the following assessment of Szuchon's defense:

> The only evidence as to [Szuchon]'s diminished capacity and his drugged or intoxicated condition came from [Szuchon] himself, through statements he had made to various people subsequent to the murder/kidnaping. This evidence was vague and equivocal and was overwhelmingly countered by the testimony of Aldo DeSanto, Mary Sadowski, Frederick Pusch (who was a teacher of the emotionally disturbed), the salesmen who sold [Szuchon] the rifle and bullets, the arresting officers and others, that on April 14 and 15, 1981, [Szuchon] was calm, deliberate and coherent and exhibited no signs of intoxication or drugged condition. Moreover, the Commonwealth introduced Dr. Walter Finken, a psychiatrist at Warren State Hospital who had examined [Szuchon], discussed his participation in the crimes with him and testified that in his opinion, at the time of the incident [Szuchon] was able to comprehend the nature and the quality of his acts, knew right from wrong, and was capable of forming the specific intent to commit murder.

_____

2. By negating the element of specific intent, a successful diminished-capacity defense reduces the charge from first to third-degree murder. Commonwealth v. Travaglia, 661 A.2d 352, 359 (Pa. 1995).

7

Szuchon, 484 A.2d at 1369.

In 1986, Szuchon filed a pro se petition for state collateral review under the Post-Conviction Hearing Act ("PCHA"). The trial court appointed counsel, who filed an amended petition raising claims of trial court error and of ineffective assistance of trial and appellate counsel. The trial court denied the petition without an evidentiary hearing, ruling that the claims were either meritless or procedurally barred because they had been litigated on direct appeal. The Superior Court affirmed, and the Pennsylvania Supreme Court denied allowance to appeal.

In 1992, Szuchon filed a second counseled collateral-review petition, this time under the amended and renamed Post-Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. S 9541 et seq. Szuchon again raised claims of ineffective assistance of trial and appellate counsel. The trial court ruled that the claims were waived either because they were previously litigated or because Szuchon failed to raise them in a prior proceeding. The Pennsylvania Supreme Court affirmed. Commonwealth v. Szuchon, 633 A.2d 1098 (Pa. 1993).

In April 1994, the Governor of Pennsylvania signed a warrant for Szuchon's execution. On July 1, 1994, Szuchon moved for a stay and filed a counseled habeas petition pursuant to 28 U.S.C. S 2254 in the District Court for the Western District of Pennsylvania.3 After the District Court granted the stay, but before the Commonwealth filed an answer to the habeas petition, Szuchon moved to hold the proceeding in abeyance and to continue the stay while he exhausted state remedies on three claims that he had yet to present to the state courts.4 The District Court granted

_____

3. Szuchon had filed two previous habeas petitions, in 1985 and 1990, both of which were dismissed without prejudice.
4. The three claims were (1) failure to instruct the jury that a life sentence means no parole, Simmons v. South Carolina, 512 U.S. 154 (1994); (2) a Fifth Amendment violation in the admission of Dr. Walter Finken's testimony and his report, Estelle v. Smith, 451 U.S. 454 (1981); and (3) a double jeopardy violation in permitting the jury to consider the aggravating circumstance of creating a grave risk of death to Aldo DeSanto after it had acquitted Szuchon of the attempted murder of DeSanto. Szuchon conceded that the Simmons claim had not been presented to the state courts, and he noted that the Estelle and double-jeopardy claims "appear not to have been exhausted." App. 184-85.

8

Szuchon's motion, held the proceeding in abeyance, and ordered the stay continued.

In January 1996, Szuchon returned to state court and filed a third post-conviction petition (his second petition under the PCRA). The trial court ruled that the claims were either previously litigated or waived for failure to raise them in a prior proceeding. The Pennsylvania Supreme Court affirmed. Commonwealth v. Szuchon, 693 A.2d 959 (Pa.), cert. denied, 522 U.S. 889 (1997).

In March 1998, Szuchon filed in the District Court an amended habeas petition in which he raised a total of 16 claims of error at trial and sentencing. The Commonwealth filed an answer in which it expressly waived nonexhaustion as to all claims. App. 284-85 ("To the extent that Petitioner may have failed to exhaust available state remedies as to any claim presented in the instant Petition, the Commonwealth formally waives any non-exhaustion defense it may have available."). As to the numerous claims that Szuchon had presented to the state courts in his second and third post-conviction petitions, the Commonwealth argued that those claims were procedurally defaulted, and it argued that the claim under Mills was either barred by Teague v. Lane, 489 U.S. 288 (1989), or without substantive merit. The Commonwealth did not assert a procedural-default defense in its answer to the Mills claim.

The matter was referred to a Magistrate Judge, who concluded that all claims were exhausted and not defaulted. Applying pre-AEDPA law because Szuchon's initial habeas petition was filed prior to AEDPA's enactment, the Magistrate Judge recommended that all claims but one be denied, agreeing with Szuchon that the jury instructions at sentencing violated the Eighth Amendment under Mills. The Magistrate Judge recommended that the writ be granted on the condition that the Commonwealth either conduct a new sentencing hearing within 120 days or impose life imprisonment.

The Commonwealth objected to the recommendation by arguing for the first time that the Mills claim should be denied as procedurally defaulted given Szuchon's failure to

9

exhaust the claim and the present unavailability of state remedies. The District Court summarily overruled the objections, adopted the Report and Recommendation, granted the writ in accordance with the Magistrate Judge's recommendation, and denied Szuchon's remaining claims. The District Court also issued a certificate of appealability but failed to specify the issues on which Szuchon had made a substantial showing of the denial of a constitutional right. See 28 U.S.C. S 2253(c)(3) ("The certificate of appealability . . . shall indicate which specific issue or issues satisfy the showing required . . . ."). The Commonwealth timely appealed (C.A. No. 00-9000), and Szuchon timely cross-appealed (C.A. No. 00-9001).

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 28 U.S.C. S 2254(a). We have jurisdiction over the Commonwealth's appeal pursuant to 28 U.S.C. S 1291. As to Szuchon's cross-appeal, we have jurisdiction pursuant to 28 U.S.C. SS 2253 and 1291 over the issues that satisfy the certificate of appealability standard. See United States v. Cepero, 224 F.3d 256, 261-62 (3d Cir. 2000) (en banc) (holding that issuance of a certificate of appealability is a jurisdictional requirement). Because the District Court failed to specify the issues for appeal, we will undertake that analysis here.[5]

_____

5. Ordinarily, when a District Court grants a certificate of appealability but fails to specify the issues for appeal, we would remand the matter for a clarification of the order granting the certificate. See, e.g., United States v. Weaver, 195 F.3d 52, 53 (D.C. Cir. 1999). We have elected not to follow that course here, as the parties had fully briefed this matter by the time it was brought to our attention that the certificate of appealability was inadequate. See Williams v. United States, 150 F.3d 639, 641 (7th Cir. 1998) (holding that remand for specification of the issues was unnecessary where appeal was fully briefed); Tiedeman v. Benson, 122 F.3d 518, 522 (8th Cir. 1997) (same). Moreover, given that 20 years have now passed since Szuchon's trial, we are reluctant to delay the resolution of this matter with a remand. We, therefore, will view the District Court's certificate as a nullity given its nonconformity to S 2253(c)(3), and we construe Szuchon's timely filed notice of appeal as a request for this Court to issue a certificate of appealability. See Coady v. Vaughn, 251 F.3d 480, 486 (3d Cir. 2001) ("Because Coady filed a timely notice of appeal, we construe this notice as a request for a certificate of appealability pursuant to Section 2253(c)(1) and Fed. R. App. Proc. 22(b).").

10

A certificate of appealability may issue only upon "a substantial showing of the denial of a constitutional right." 28 U.S.C. S 2253(c)(2). If "a district court has rejected the constitutional claims on the merits, the showing required to satisfy S 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Our review is plenary on the merits of the claims over which we have jurisdiction, as the District Court relied exclusively on the state court record in deciding the petition and did not hold an evidentiary hearing. Hartey v. Vaughn , 186 F.3d 367, 371 (3d Cir. 1999). In addition, Szuchon filed his initial petition prior to AEDPA's enactment, and the parties do not dispute that pre-AEDPA law governs Szuchon's claims. See Lindh v. Murphy, 521 U.S. 320, 326 (1997).6 Before AEDPA, state court factual findings were presumed correct unless, inter alia, they were not" `fairly supported by the record.' " Pemberthy v. Beyer, 19 F.3d 857, 864 (3d Cir. 1994) (quoting the former 28 U.S.C. S 2254(d)(8)). State court legal conclusions were reviewed de novo, as were mixed questions of law and fact. McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999).

III. TRIAL CLAIMS

We first address Szuchon's cross-appeal from the denial of his claims of error in connection with the trial. His claims involve his right to due process, and his contention that psychiatric evidence was not properly obtained and was improperly used at trial. The District Court properly reached the merits of these claims.

A. Due Process Claims

Szuchon contends that he was denied a fair trial because the jury was prejudiced by comments it overheard; the jury engaged in premature deliberations; the court ordered him

_____

6. Although this action was commenced in the District Court pre-AEDPA, this appeal was filed post-AEDPA, and thus we must apply the AEDPA certificate of appealability requirement. Slack , 529 U.S. at 482.

11

shackled during the proceedings; and he was provided insufficient notice that he faced the death penalty. We will deny a certificate of appealability on each claim.

1. Prejudicial Comments

Szuchon's jury was sequestered throughout the trial, and while out for dinner one weekend, a patron at a local restaurant commented "hang the bastard" as three jurors were entering the establishment. On a separate occasion during that weekend, a patron at a different restaurant remarked "he is guilty" within earshot of three different jurors. The court's tipstaff promptly reported these incidents the following Monday. Before resuming trial that morning, the court conducted an individual voir dire with each of the six jurors who were exposed to the remarks. Each juror stated that the remarks would have no adverse affect on their ability to remain impartial and to decide the case solely on the evidence.

It is settled that "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." Smith v. Phillips , 455 U.S. 209, 217 (1982). Instead, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." Id. Here, after learning of the restaurant incidents, the judge promptly questioned the jurors, each of whom separately and unequivocally stated that the remarks would not affect their ability to decide the case based on the evidence. After assessing the jurors' credibility and observing their demeanor, the court found that they would remain impartial and could continue to serve. The record amply supports this finding, and we defer to its correctness on federal habeas review. Patton v. Yount, 467 U.S. 1025, 1038 (1984). In addition, we reject Szuchon's suggestion that the court was required to question the jury as a whole; the judge was plainly within his discretion in choosing to limit the questioning to the six jurors who were exposed to the remarks. The record before us provides no basis for second-guessing the trial judge's handling of the situation.

12

Szuchon also contends that he was denied due process by another alleged instance of improper jury contact. He claims that, after he physically assaulted a state trooper who was leaving the witness stand (an incident that resulted in his shackling, which will be discussed below), the jury was escorted from the courtroom, at which time the court's tipstaff allegedly remarked that Szuchon's behavior was the "worst . . . he had seen in his many years of service at the courthouse." This incident was not brought to the trial judge's attention. We are satisfied, nevertheless, that the tipstaff's remark was not of the sort that could have posed a threat to the jury's impartiality in its consideration of the rather overwhelming evidence of Szuchon's guilt of first-degree murder. The remark, while inappropriate, did not deprive Szuchon of a fair trial.

## 2. Premature Deliberations

Szuchon alleges that the jury voted to convict him of first-degree murder by the third day of the prosecution's case, and that it decided to impose a death sentence by the fourth or fifth day. He has submitted a declaration to this effect from one member of the jury. These alleged premature deliberations were not brought to the trial court's attention. Although these allegations are certainly troubling in the abstract, we discern no due process violation on the record before us. "[W]hen there are premature deliberations among jurors with no allegations of external influence on the jury, the proper process for jury decisionmaking has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial." United States v. Resko, 3 F.3d 684, 690 (3d Cir. 1993) (emphasis in original). Given the extensive evidence of Szuchon's guilt of first-degree murder and the relative weakness of the evidence regarding his diminished-capacity, we have no reason to doubt that the jury's decision was based on the evidence. Szuchon has made no showing that he was prejudiced by the alleged premature deliberations. Cf. Anderson v. Calderon, 232 F.3d 1053, 1098-99 (9th Cir. 2000) ("Anderson's claim [of premature deliberations] must fail because there is absolutely no evidence that the alleged

13

misconduct has prejudiced Anderson in any way, much less `to the extent that he has not received a fair trial.' ") (citation omitted). Furthermore, the jury acquitted Szuchon on the charge of attempted murder of Aldo DeSanto, which suggests that it in fact gave due regard to the court's instructions and deliberated the evidence at the close of the trial. "When the jury is instructed to base its verdict solely on the evidence and it acquits the defendant of certain counts, such factors indicate that the jury was not biased." United States v. DiSalvo, 34 F.3d 1204, 1226 (3d Cir. 1994) (citing United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993)). In short, the record indicates that the alleged premature deliberations did not deprive Szuchon of his right to a fair trial before an impartial jury.

3. Shackling

Szuchon contends that his trial was unfair because the court ordered his legs and right hand shackled after he assaulted a Commonwealth witness. Szuchon leapt from his chair during the course of the trial and grabbed and kicked a state trooper who was leaving the witnesses stand. The assault occurred in full view of the jury, and court security subdued Szuchon on the floor in front of the jury box. As a result of the incident, and after hearing from counsel, the trial court ordered Szuchon shackled to his chair and counsel table for the remainder of the trial and sentencing. Szuchon's left hand remained unshackled so that he could take notes and assist counsel, and Szuchon was not gagged.

In Illinois v. Allen, 397 U.S. 337 (1970), the Court recognized that a defendant is prejudiced when he appears before a jury in shackles: "Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." Id. at 344. The Court added, however, that sometimes "binding and gagging might possibly be the fairest and most reasonable way to handle" a disruptive defendant. Id.

14

The record here supports the decision to shackle Szuchon given his violent and disruptive behavior, particularly in light of the trial court's determination that certain jurors were palpably frightened of Szuchon following the assault. In addition to his assault upon the trooper, Szuchon had been verbally disruptive on two prior occasions during the trial. Szuchon had also become noticeably upset after hearing the testimony of an earlier prosecution witness, when he "attempted to get up from his seat . . ., and said either I can't take this shit[or] I don't have to tolerate this shit." App. 2920. After that earlier incident, the court allowed defense counsel to remove Szuchon from the courtroom for several minutes to calm himself down. Szuchon had thus displayed a pattern of disruptive conduct prior to the assault upon the trooper.

The trial court carefully weighed but rejected alternatives to shackling, such as barring Szuchon from the courtroom or issuing a contempt citation. The court also considered but rejected the possibility of attempting to conceal the shackles from the jury, explaining as follows:

> It's my opinion that a couple of jurors were so frightened last night that it would be more productive for them to know that he is in some fashion shackled to his chair, and it is my belief that the possibilities of the prejudicial effect of knowing that he is unable to leave his chair are far less than the productive, if you will, effect of them knowing that they can pay attention to the evidence without having to worry about the Defendant.

App. 2921–2922. Szuchon's counsel stated that they had no objection to revealing the shackles to the jury, and counsel raised no objection to the court's cautionary instructions regarding the shackling.7 The record fully supports the trial court's decision.

Szuchon contends that the shackling must have been unduly prejudicial. He cites to the declarations that he has

_____

7. Szuchon contends that counsel were ineffective in failing to object, but because the shackling was an appropriate sanction, the failure to object was not unreasonable.

obtained from two members of the jury, both of whom note that they "could not set aside the fact that Szuchon was shackled," and they add that another juror "was utterly terrified of Szuchon and believed that he would kill her and her family." Based on these statements, Szuchon contends that the shackling must have had a "substantial and injurious effect or influence in determining the jury's verdict." Br. of Cross-Appellant at 86. We find this argument unpersuasive. It seems unlikely that any juror could have ignored that Szuchon was shackled, and the trial court took that fact into consideration, noting its view that it would be better to reveal that Szuchon was shackled than to have the jury sit in fear that he would again spring forth and assault someone. And the jury certainly had reason to fear Szuchon because he had aggressively attacked a state trooper right in front of them. The trial court reasonably concluded that the shackling was warranted and that Szuchon's right to a fair trial would be better served by revealing the constraints. The court also carefully instructed the jury to remain focused solely on the evidence. The declarations from the two jurors cast no doubt upon the validity of the trial court's decision -- in fact, the declarations seem to verify the court's assessment that certain jurors were truly frightened and that shackling would help them to focus on the evidence rather than on Szuchon. We find no violation of due process.

4. Notice of the Death Penalty

Szuchon contends that he was provided inadequate notice that he faced the death penalty. He relies exclusively on Lankford v. Idaho, 500 U.S. 110 (1991). In that case, the prosecution advised the defendant in a presentencing order that it would not seek the death penalty. At sentencing, there was no discussion of death as a possible sentence, and the defendant argued only the merits of various terms of imprisonment. The trial court sua sponte sentenced the defendant to death. The United States Supreme Court reversed, holding that the defendant was denied due process because he did not have "adequate notice of the critical issue that the judge was actually debating." Id. at 120. The Court explained that "[n]otice of issues to be

16

resolved by the adversary process is a fundamental characteristic of fair procedure." Id. at 126.

Szuchon's case is readily distinguishable from Lankford. The trial court formally notified Szuchon on the record at least a week before jury selection that he faced the death penalty. The notice was given at the same time that Szuchon's trial counsel were appointed (as will be discussed in more detail below), and thus Szuchon's counsel went to trial with as much notice of the death penalty as they possibly could have had under the circumstances. Moreover, Szuchon insisted on proceeding to trial with only one week for his counsel to prepare, as he refused to waive the 180-day speedy-trial rule. We would be hard-pressed, at the least, to distinguish the self-inflicted harm that Szuchon caused by refusing to continue the trial from any prejudice that might have resulted from his not having had more notice that this was a death penalty case.

Szuchon has also made no showing that he was prejudiced by the alleged failure to have earlier notice: there is no evidence that either pre-trial counsel or trial counsel were hindered in their preparations due to the allegedly inadequate notice. Moreover, Szuchon makes no claim that he was unaware of the evidence and witnesses that were presented against him at trial and sentencing. Cf. Duvall v. Reynolds, 139 F.3d 768, 797-98 (10th Cir. 1998) (finding no due process violation even though state failed to afford defendant notice of evidence it intended to produce to establish its aggravating circumstance); Hale v. Gibson, 227 F.3d 1298, 1236 (10th Cir. 2000) (holding that there was no due process violation where state amended bill of particulars on first day of trial to add an aggravating circumstance that it had not previously noted). Nothing in this record suggests that the notice Szuchon received violated his right to due process.

In sum, Szuchon has not made a substantial showing of the denial of a constitutional right on his due process claims, and we will deny a certificate of appealability.

B. Psychiatric Evidence Claims

Szuchon contends that he was denied his right under Ake v. Oklahoma, 470 U.S. 68 (1985), to the assistance of

17

a forensic psychiatrist at state expense. He also contends that, as to the psychiatric examination that was conducted, he was denied his right under Estelle v. Smith , 451 U.S. 454 (1981), to be advised that his statements could be used against him at trial. Our analysis of these claims requires that we first summarize the relevant pre-trial events.

After his preliminary arraignment, Szuchon privately retained his own counsel, who promptly filed a "Motion for Mental Health Examination." Counsel requested "an examination to determine [Szuchon's] present mental health status, and his present status as to competency." App. 331. He also asked that the court order "a determination as to [Szuchon's] criminal responsibility, as provided within the Mental Health Act." Id.  The trial court granted the motion and ordered that "any reports of any examination shall be supplied to the attorney for the Defendant and the Commonwealth." App. 333.

Szuchon was transferred to Warren State Hospital, where he was examined by Dr. Walter Finken. The examination covered Szuchon's mental health, his competency to stand trial, and his "criminal responsibility." It is undisputed that Szuchon was not advised that his statements could be used against him at trial and sentencing. Doctor Finken's findings were reported to the trial court in a letter signed by Dr. Harold J. Reinhardt, also of Warren State Hospital. Copies of the letter (which we will refer to as the "Finken Report") were forwarded to the Commonwealth and to Szuchon's counsel. Doctor Reinhardt (who it is clear merely signed the letter, the letter actually contained the findings of Dr. Finken) advised the court as follows: Szuchon was competent to stand trial; he was not insane within the meaning of the M'Naughten test; although Szuchon indicated that he was on various drugs at the time of the offenses, there was no indication that he suffered from "a serious toxic confusion or psychotic state at the time"; and "[i]n interviewing the patient, one did not get the impression that he planned or obtained the gun with the specific purpose of shooting Judy." Supplemental Appendix 5.

Thereafter, Szuchon filed a "Motion for Appointment of a Forensic Psychiatrist," noting that he was exploring an insanity defense but that he lacked sufficient funds to

18

retain a psychiatrist "who could examine the Defendant, and testify as to the Defendant's mental state and capacity at the time of the incident at Defendant's trial." Szuchon then filed a "Notice of Insanity or Infirmity Defense" and advised that he would provide the name of any expert he would call after he received funds from the court to hire a psychiatrist. On September 3, 1981, after oral argument, the trial court denied without prejudice Szuchon's motion for appointment of a psychiatrist. The reasons for the court's ruling are not apparent in the record before us.

On September 28, 1981, Szuchon's counsel moved to withdraw because Szuchon was refusing to cooperate in his defense and their relationship had deteriorated. The trial court granted the motion and advised Szuchon of the need to promptly retain new counsel. Although incarcerated, Szuchon was afforded numerous opportunities to contact his family by telephone to arrange for the hiring of a new attorney. Szuchon neglected to do so. On October 5, the trial court appointed two attorneys as Szuchon's counsel in the event Szuchon failed to hire his own. Szuchon consented to the court's appointment of counsel, App. 375–76, and he never privately retained counsel. At a hearing the next day, counsel lodged a motion to have Szuchon examined by Dr. David Paul, a local forensic psychiatrist. App. 1583. The trial court granted the motion. App. 377. In the days that followed, however, Szuchon refused to be examined because he claimed that Dr. Paul would be biased given his past work as a consultant for the Erie County Jail.

Jury selection commenced on October 12, which was less than a week after Szuchon's counsel were appointed. Szuchon, however, insisted on proceeding to trial on that date, and he repeatedly refused a continuance. Szuchon claimed that his right to a speedy trial would be violated by any continuance, and thus he forced the trial to commence even after the court made it clear to him that his counsel would likely benefit from additional time to prepare.

As noted, Szuchon presented a diminished–capacity defense, but he presented no expert mental–health evidence. The prosecution, in contrast, presented the testimony of Dr. Finken and introduced the Finken Report,

19

which contained numerous statements that Szuchon had made about his role in the murder and his mental status. The record is clear that the main purpose for which the prosecution used Dr. Finken's testimony and the Finken Report at trial was to establish that Szuchon acted with a specific intent, which, in the end, was the only disputed issue at trial given that Szuchon's defense was diminished capacity and he made no attempt to deny that he murdered Judy Snyder.

With this background, we turn to the claims under Ake and Estelle. Szuchon contends that the trial court violated Ake insofar as Dr. Finken was the expert appointed to evaluate him, as Dr. Finken was not appointed to assist the defense. The Supreme Court held in Ake that, "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83. Had Dr. Finken been the only psychiatrist appointed in this case, we would agree that Ake was not satisfied. The record reflects that the trial court never ordered Dr. Finken to assist the defense; Szuchon's counsel apparently had no contact and did not discuss possible defenses with Dr. Finken; and the Finken Report was addressed to, and clearly prepared for the benefit of, the court. Under Ake, "evaluation by a `neutral' court psychiatrist does not satisfy due process." Smith v. McCormick, 914 F.2d 1153, 1158 (9th Cir. 1990).

But Dr. Finken was not the only psychiatrist appointed, as the trial court granted Szuchon's request before trial to be examined by Dr. Paul. Szuchon simply refused to be examined by Dr. Paul and insisted on proceeding to trial with no expert evidence. Ake, however, requires only that a court provide "access" to an independent psychiatrist. Ake, 470 U.S. at 83. Szuchon maintained that Dr. Paul would be biased, but Szuchon presented no evidence to substantiate that allegation. Moreover, we certainly could not infer that a bias might have existed given that it was Szuchon's counsel who expressly requested that Dr. Paul be

20

appointed. Counsel obviously had no objection to Dr. Paul's affiliation with the Erie County Jail, and there is absolutely no evidence that Dr. Paul would have been unable to assist the defense. On this record, the trial court satisfied Ake by granting Szuchon's request to be examined by Dr. Paul, an independent psychiatrist who was made available to the defense at state expense. We will deny a certificate of appealability on the Ake claim.[8]

Szuchon next claims that he was denied his Fifth Amendment right under Estelle to be advised before his examination with Dr. Finken that his statements could be used against him. In Estelle, a state trial court ordered an evaluation to determine the defendant's competency to stand trial for capital murder. The defendant was not informed of his Miranda rights before the evaluation, was adjudged competent, and convicted. The defendant did not raise a mental-status defense, and he offered no psychiatric evidence. At the capital sentencing proceeding, the trial court allowed the state to present the psychiatrist's testimony concerning "future dangerousness." The psychiatrist testified based not only upon his observations of the defendant but also gave detailed descriptions of the defendant's statements about the crime. The Supreme Court vacated the death sentence, holding that "[a] criminal defendant who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." 451 U.S. at 468.

Szuchon argues that admission of Dr. Finken's testimony and the Finken Report violated his privilege against self-incrimination. He further claims that counsel were ineffective in failing to object to admission of this evidence.[9]

_____

8. The District Court denied relief on the ground that Ake could not apply retroactively to Szuchon's case. Szuchon's conviction, however, became final after Ake was decided, and thus Szuchon was entitled to the benefit of that decision. Nevertheless, just as we can affirm a judgment on the merits on an alternative basis, see, e.g., Felix v. Virgin Islands Gov't, 702 F.2d 54, 57 (3d Cir. 1983), we can deny a certificate of appealability on any ground with support in the record.

9. The Commonwealth argues that the Pennsylvania Supreme Court rejected these claims in the third post-conviction proceeding as waived,

We will grant a certificate of appealability because Szuchon has shown that it is at least debatable whether admission of the Finken evidence was inconsistent with the holding in Estelle. On the merits, however, we need not decide whether the admission was in fact an Estelle violation, as any error, even assuming there was one, was undoubtedly harmless and insufficient to warrant habeas relief. Cf. Penry v. Johnson, 121 S. Ct. 1910, 1919-20 (2001) ("Even if our precedent were to establish squarely that the prosecution's use of the Peebles report violated Penry's Fifth Amendment privilege against self-incrimination, that error would justify overturning Penry's sentence only if Penry could establish that the error [was not harmless]").

A writ of habeas corpus may issue only if the reviewing court finds that the constitutional error "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993). Even absent Dr. Finken's testimony and the Finken Report, the Commonwealth presented overwhelming evidence of Szuchon's specific intent to kill. The Commonwealth established that Szuchon told numerous individuals before the murder that he planned to kill Judy Snyder. After the murder, Szuchon confessed to the police that he intended to kill Snyder because she would not return to being his girlfriend. The Commonwealth further established the deliberate manner in which Szuchon purchased the bullets and rifle the morning of the killing and later drove to the restaurant where Judy Snyder worked, waiting patiently for her in the parking lot while reading a newspaper. 10 Szuchon

_____

and that Szuchon therefore committed a procedural default. We disagree. The Pennsylvania Supreme Court denied these claims solely on the merits, ruling that, "[s]ince appellant argued diminished capacity throughout the guilt and penalty phases. . ., his Fifth Amendment privilege against self-incrimination was not violated by Dr. Finken's psychiatric examination and subsequent testimony." 693 A.2d at 963. Thus, the merits are properly before us.

10. The Finken Report actually benefitted Szuchon on this front, as the jury learned of Dr. Finken's opinion that, "[i]n interviewing the patient, one did not get the impression that he planned or obtained the gun with the specific purpose of shooting Judy."

22

kidnaped Snyder, DeSanto, and Sadowski at gunpoint, telling them, "If you all don't get into the car, I'll blow your fucking heads off." Szuchon, 484 A.2d at 1368. He kept the rifle trained on the three victims as he forced them to drive to a remote area, telling them to "make your act of contrition or say your confessions if you want to go to heaven because at the end of this night I'm surely going to hell." Id. He ordered Snyder to walk into a corn field, and when she refused, he shot her twice in the back. This evidence unequivocally established that Szuchon acted with a specific intent to kill Judy Snyder.

Szuchon's evidence of diminished capacity, by contrast, was weak. Szuchon called three lay witnesses in his defense, none of whom testified to a diminished capacity on the date of the murder. The only evidence presented of a diminished capacity was the statements Szuchon had made to the police and to Dr. Finken. Szuchon told the police the day after the murder that he had ingested a "couple lines" of cocaine and "five to six [Q]uaalude tablets." He told Dr. Finken that he had taken "six to eight" Quaaludes and "some cocaine." (Of course, had the Finken evidence been excluded, the jury would only have had Szuchon's statements to the police.) There was no evidence that Szuchon consumed any alcohol or other drugs on the day of the murder.

In Pennsylvania, a defendant who relies on evidence of drug consumption must show that he was "overwhelmed by an intoxicant to the point of losing his rationality, faculties, or sensibilities so as to negate or lower the specific intent to kill." Commonwealth v. Edmiston, 634 A.2d 1078, 1085 (Pa. 1993) (citing Commonwealth v. Breakiron, 571 A.2d 1035 (Pa. 1990)). Szuchon's evidence fell far short of that standard. At best, he showed that he ingested a small quantity of cocaine and several sedatives, but by no means could the jury have inferred from that limited evidence that Szuchon was overwhelmed to the point of losing his rationality. Moreover, the remainder of the trial evidence (excluding Dr. Finken) firmly established that Szuchon was well in control of his faculties. Every witness who had contact with Szuchon around the time of the murder-- including the rifle and bullet salesmen, DeSanto, Sadowski,

23

Pusch, and the arresting officers –– testified that Szuchon had seemed rational and showed no signs of intoxication or a drugged condition. Furthermore, the manner in which Szuchon carried out the murder strongly indicated that he knew what he was doing.

Thus, while the jury might have found the Finken evidence compelling, the overwhelming remaining evidence of Szuchon's specific intent and the paucity of his diminished-capacity defense convince us that the outcome of this trial would have been exactly the same without Dr. Finken's testimony and the Finken Report. Similarly, Szuchon cannot show prejudice under Strickland v. Washington, 466 U.S. 668 (1984), to support his claim that counsel were ineffective in failing to object to its admission. Accordingly, we will affirm the District Court's denial of relief on these claims.11

IV. SENTENCING CLAIMS

A. Mills

We turn next to the sentencing phase and address first the Commonwealth's appeal of the District Court's issuance of the writ based on Mills v. Maryland, 486 U.S. 367 (1988). The Supreme Court held in Mills that a death sentence should be vacated as violative of the Eighth Amendment if there is a substantial probability that reasonable jurors, upon receiving the trial judge's instructions and attempting to complete the verdict form based on those instructions, may have thought that they could only consider those mitigating factors which they unanimously found to exist.

_____

11. Szuchon also claims that Estelle was violated by admission of the psychiatric evidence at sentencing. We do not reach that claim given our disposition of this appeal, although we note that we discern no error in that regard. The Commonwealth used Dr. Finken's testimony and the Finken Report at sentencing solely in rebuttal to Szuchon's claims of mitigation based on his alleged mental deficiencies. Admission of the evidence for that purpose was not inconsistent with Buchanan v. Kentucky, 483 U.S. 402, 424 (1987) (holding that no Estelle violation occurs when the state uses a psychiatric report in rebuttal after the defendant places his mental status in issue).

486 U.S. at 376. The District Court concluded that the instructions at Szuchon's sentencing violated this principle. The Commonwealth argues that the Mills claim is procedurally defaulted because Szuchon never raised the claim in state court, his state remedies are now foreclosed, and he cannot show cause and prejudice or a fundamental miscarriage of justice. We agree that the claim is defaulted and barred from review on the merits.[12]

Preliminarily, Szuchon argues that the procedural–default defense was waived because the Commonwealth failed to assert that defense in its answer to the amended petition. A state ordinarily is required to assert a procedural default in its answer if it intends to rely on that defense. See Esslinger v. Davis, 44 F.3d 1515, 1524 n.32 (11th Cir. 1995) ("The state can waive a procedural bar to relief by explicitly waiving, or by merely failing to assert the bar in its answer to the habeas petition."); Reese v. Nix, 942 F.2d 1276, 1280 (8th Cir. 1991) ("The district court properly held that Nix waived his procedural default defense by failing to affirmatively assert it in his answer to Reese's petition for habeas relief."); Delap v. Dugger, 890 F.2d 285, 302 n.20 (9th Cir. 1989) ("The state did not raise the issue of procedural default in its response to Delap's habeas petition, and thus has waived procedural default."); see also Trest v. Cain, 522 U.S. 87 (1997) (noting that "procedural default is normally a defense that the State is obligated to raise and preserve if it is not to lose the right to assert the defense thereafter").

On the record here, we see no reason to excuse the Commonwealth's failure to assert the default in its answer. We find, however, that the more troubling aspect of this case is Szuchon's failure to raise his Mills claim, or any sort of challenge to the jury instructions regarding unanimity in finding the mitigating circumstances, in any of his numerous state court proceedings. Thus, while the Commonwealth may well have waived its procedural–default

_____

12. The Commonwealth argues in the alternative that the Mills claim is barred by Teague v. Lane, 489 U.S. 288 (1989), or without merit. Given our disposition on the procedural default, we do not reach those arguments.

defense, the fact remains that Szuchon deprived the state courts of the opportunity even to examine the Mills issue. We cannot ignore this fact and the resulting procedural default. We conclude, therefore, that the District Court should not have reached the merits of the Mills claim. We reach this conclusion sua sponte given the substantial concerns of comity and federalism that are implicated by Szuchon's decision to bypass state court review altogether.13

_____

13. A court of appeals can raise a procedural default sua sponte. Smith v. Horn, 120 F.3d 400, 408 (3d Cir. 1997); see also Windham v. Merkle, 163 F.3d 1092 (9th Cir. 1998); Ortiz v. Dubois , 19 F.3d 708 (1st Cir. 1994); Washington v. James, 996 F.2d 1442 (2d Cir. 1993); Hardiman v. Reynolds, 971 F.2d 500 (10th Cir. 1992). We retain this discretion because the doctrine of procedural default, while not a jurisdictional rule, "is grounded upon concerns of comity between sovereigns and often upon considerations of judicial efficiency." Hardiman, 971 F.2d at 503 (citations omitted). "Because these concerns substantially implicate important interests beyond those of the parties, it is not exclusively within the parties' control to decide whether such a defense should be raised or waived." Id. In Smith, we explained that our discretion to address a default should be guided by the factors discussed in Granberry v. Greer, 481 U.S. 129 (1987), with respect to the sua sponte consideration of nonexhaustion. 120 F.3d at 408. Thus, we held that the values of comity, federalism, judicial efficiency, and the "ends of justice"
must be weighed in determining whether to consider the default. Id. We noted that it might be inappropriate to raise a default where "it is evident
that a miscarriage of justice has occurred," id., explaining that a miscarriage of justice in this context " `should include cases where the record is well developed and the merits strongly support the petitioner's claim.' " Id. (quoting Washington v. James, 996 F.2d 1442 (2d Cir. 1993) (Oakes, J., dissenting)).

Smith was a capital case in which the petitioner claimed that the trial court issued erroneous jury instructions on the elements of first-degree murder. Although the petitioner might have waived that claim in state court, the Commonwealth in Smith did not argue a default at any stage of the habeas proceeding: "not in the district court, not in its briefing before this Court, and not at oral argument." 120 F.3d at 407. We declined to raise the matter sua sponte, noting that, "not only do the merits support Smith's claim, . . . but the record as it relates to the merits is as well-developed as it can be," whereas the record as to the default was "sparse" and would have required"not simply supplemental briefing but a remand to the district court for supplemental fact finding."
120 F.3d at 409. Here, the Mills claim is similarly one of erroneous jury instructions and the record is fully developed, but unlike Smith, the

26

Szuchon's blatant default of his Mills claim essentially compels us to raise the issue sua sponte. The requirement that a prisoner afford the state courts a chance to correct an alleged constitutional violation before invoking federal jurisdiction is central to our federal system. As the Supreme Court has frequently explained, the exhaustion requirement " `is principally designed to protect the state courts' role in the enforcement of federal law[.]' " Duncan v. Walker, 121 S. Ct. 2120, 2128 (2001) (quoting Rose v. Lundy, 455 U.S. 509, 518 (1982)). "Comity thus dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief." O'Sullivan v. Boerckel, 526 U.S. 838, 844 (1999). Moreover,"[t]he exhaustion rule promotes comity in that it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation." Duncan, 121 S. Ct. at 2128 (quotation marks and citations omitted).

That "unseemly" result, however, is precisely what would happen here, as we are asked to enforce the District Court's decision to overturn Szuchon's sentence even though Szuchon never afforded the state courts any chance to correct the alleged error. Significantly, we find no indication

_____

record as to the default is also fully developed, and the parties briefed the default in both the District Court and in this Court. Our consideration of the default therefore would not require supplemental briefing or a remand. Moreover, we observed in Smith that "when the state has never raised an issue in either the district court or this Court we should be even less inclined to raise it sua sponte than when the state either has raised the issue here only belatedly or has raised it in the district court but has not pursued that line of attack in the court of appeals." 120 F.3d at 409. The Commonwealth never mentioned a default in Smith, but here it asserted the defense in its Objections to the
Report and Recommendation and it has vigorously pursued it on appeal. Thus, aside from failing to assert the defense in its answer, the Commonwealth has done all it could do to raise the default. For these reasons, and for the reasons set forth in the text, we will address Szuchon's procedural default of the Mills claim.

that Szuchon made any effort to present a Mills claim during his numerous state court proceedings, and it appears that Szuchon merely decided to skip the process of state court review, perhaps in the belief that he might obtain a more favorable result in federal court. We simply cannot overlook this attempt to nullify the state courts' vital role in preserving the constitutional rights of state prisoners. Cf. Windham, 163 F.3d at 1101 (reaching default sua sponte because "[i]t would be violative of comity and `our federalism' for this court to hold that the State of California violated the Equal Protection Clause by purposefully discriminating against women because of their gender when that issue was never presented to the trial court").

We reject Szuchon's suggestion that he exhausted a Mills claim. Szuchon argues that he presented the claim on direct appeal, but the record reflects that he merely challenged the trial court's alleged error in failing to elaborate on the meaning of the aggravating and mitigating circumstances, and in failing to read the language of every circumstance set forth in the statute. App. 431–33, 458–60. These claims, which were raised as matters of state law, did not put the state courts on notice that Szuchon wished to raise an Eighth Amendment challenge to the instructions regarding unanimity in the jury's finding of mitigating circumstances. Indeed, nowhere in his state appellate brief did Szuchon even mention, much less challenge, the trial court's use of the word "unanimous" in the instructions. Szuchon also contends that he exhausted a Mills claim in the first post-conviction proceeding, but the claim he presented there, see App. 564, was merely an ineffective-assistance-of-counsel version of the claim from the direct appeal. Moreover, the claim was raised in a pro se petition that was superceded by a counseled petition, and counsel did not raise a Mills argument.

Significantly, Szuchon offers no argument that he even attempted to raise a Mills claim in his second or third post-conviction proceedings, which is most troubling given that both of those proceedings were commenced long after Mills was decided. Indeed, the third proceeding was commenced in 1996 after this habeas proceeding was held in abeyance

28

at Szuchon's request so that he could pursue state remedies on three claims that he believed were unexhausted. See note 4, supra. Szuchon had raised a Mills claim in his habeas petition in 1994 and thus he knew of the claim at that time, see App. 176-77, yet he elected not to present the claim to the state courts even though he had as much reason to believe the Mills claim was unexhausted as he had for his other claims. On this record, the failure to exhaust the Mills claim is difficult to fathom.

It would now be futile for Szuchon to return to state court to exhaust the Mills claim, and, further, review on the merits in federal court of this defaulted claim is barred because Szuchon cannot show cause or a fundamental miscarriage of justice to overcome the default. 14

_____

14. Exhaustion will be excused as "futile" if "the state court would refuse
on procedural grounds to hear the merits of the claims." Doctor v. Walters, 96 F.3d 675, 681 (3d Cir. 1996). State law must "clearly foreclose state court review of [the] unexhausted claims." Toulson v. Beyer, 987 F.2d 984, 987 (3d Cir. 1993). The only means of review for Szuchon's Mills claim would be through another PCRA petition, see Commonwealth v. Yarris, 731 A.2d 581, 586 (Pa. 1999), but any such petition would be untimely and barred from consideration on the merits under the PCRA's one-year limitations period. See 42 Pa. Cons. Stat. S 9545(b)(1); Commonwealth v. Pursell, 749 A.2d 911 (Pa. 2000) (holding that untimely petition raising Mills claim was properly dismissed for want of jurisdiction); see also Keller v. Larkins, 251 F.3d 408, 415 (3d Cir. 2001) ("Keller is barred from seeking further relief in state court because the statute of limitations for filing another PCRA petition has expired."). None of the three statutory exceptions to the PCRA time-bar even arguably apply to Szuchon's Mills claim. See 42 Pa. Cons. Stat. S 9545(b)(1)(i)-(iii).

Szuchon relies on Commonwealth v. Cross, 726 A.2d 333 (Pa. 1999), and argues that state remedies are not clearly foreclosed. While the Pennsylvania Supreme Court did reach the merits in Cross of an otherwise seemingly time-barred Mills claim that was raised for the first time on the PCRA appeal, id. at 336-38, Szuchon's reliance on Cross is misplaced. The Pennsylvania Supreme Court has decided a line of cases since Cross, starting with Commonwealth v. Banks, 726 A.2d 374, 376 (Pa. 1999), in which it has held that the one-year period for filing under the PCRA is jurisdictional, and the only cognizable exceptions are those enumerated in the statute. We noted this development in Fahy v. Horn, 240 F.3d 239 (3d Cir. 2001), where we observed that"the Pennsylvania

29

Consequently, we will not affirm the District Court's ruling
that a new sentencing hearing is required based on Mills.

B. Witherspoon

Szuchon raises several sentencing claims on cross-
appeal, but we need go no further than his claims under
Witherspoon v. Illinois, 391 U.S. 510 (1968). 15 Szuchon

_____

Supreme Court did not clarify that the state PCRA statute was
jurisdictional and not waivable until 1999 in [ Banks]." Id. at 244; see
also Lines v. Larkins, 208 F.3d 153, 164 n.17 (3d Cir. 2000) ("Prior to
Banks there was some doubt as to the proper scope and application of
the one year limitations period under the amended PCRA."). Given these
more recent developments, we do not read Cross to suggest that the
state courts would reach the merits of Szuchon's Mills claim in an
untimely filed PCRA petition. In fact, Szuchon has cited no case in which
a court has relied on Cross to address the merits of a Mills claim despite
the untimeliness of the petition. Cf. Pursell , supra. Thus, Cross
notwithstanding, Szuchon's state remedies are clearly foreclosed.

Exhaustion, therefore, can be excused as futile, but the Mills claim is
defaulted because Szuchon failed to exhaust it despite ample
opportunities to do so. See Coleman v. Thompson , 501 U.S. 722, 735 n.1
(1991). A federal court can reach the merits of a defaulted claim only if
the petitioner shows cause and prejudice or a fundamental miscarriage
of justice. Lines, 208 F.3d at 166. Szuchon has offered no showing of
cause or any adequate explanation for his failure to exhaust. To show a
miscarriage of justice on a capital sentencing claim, the petitioner must
demonstrate "actual innocence of the death penalty," which requires a
showing "by clear and convincing evidence that, but for constitutional
error, no reasonable juror would have found the petitioner eligible for
the
death penalty under the applicable state law." Sawyer v. Whitley, 505
U.S. 333, 336 (1992). This standard focuses on actual innocence of the
minimum prerequisites that rendered the petitioner eligible for the death
penalty (which in Pennsylvania are a conviction for first-degree murder
and the finding of at least one aggravating circumstance, see 42 Pa.
Cons. Stat. S 9711(c)(iv)), "and not on additional mitigating evidence
that
was prevented from being introduced as a result of a claimed
constitutional error." Sawyer, 505 U.S. at 347. A Mills violation would
have affected the jury only in its consideration of the mitigating
evidence.
Furthermore, Szuchon has made no claim of innocence on the
underlying offense. Thus, Szuchon cannot show that a failure to address
the Mills claim would result in a fundamental miscarriage of justice.

15. While ordinarily an appellee need not file a cross-appeal in order to
rely upon any matter appearing in the record in support of the judgment

contends that the trial court improperly allowed the exclusion for cause of six prospective jurors who voiced opposition to the death penalty but who never expressed that their views would impair their ability to serve. The Commonwealth contends that the Witherspoon claims are defaulted, and thus we must address that argument first.

1. Procedural Default

Szuchon presented the Witherspoon claims on direct appeal, but the Commonwealth contends that the Pennsylvania Supreme Court refused to reach the merits because Szuchon's counsel did not object to the exclusions at voir dire and did not raise the issue in post-verdict motions. Because the Pennsylvania Supreme Court rejected the claims on state procedural grounds, the Commonwealth contends that the claims are defaulted. Szuchon counters that the Pennsylvania Supreme Court reached the merits in accordance with its "relaxed waiver rule" in capital cases. In the alternative, he argues that the state procedural rules

_____

below, see Blum v. Bacon, 457 U.S. 132, 137 n.5 (1982), this rule has a somewhat uncertain application when a habeas petitioner seeks affirmance on the basis of a constitutional claim post-AEDPA. Here, Szuchon has raised the Witherspoon issue by way of a cross-appeal, giving rise to the additional question as to whether a certificate of appealability is necessary. There is pre AEDPA caselaw to the effect that a certificate of probable cause was necessary in such a circumstance. See Roman v. Abrams, 790 F.2d 244, 245 (2d Cir. 1986) (per curiam). Post-AEDPA caselaw and commentary similarly points in that direction. See Scott v. Mitchell, 209 F.3d 854, 862-63 (6th Cir. 2000) (petitioner in capital case granted certificate of appealability to raise trial and sentencing phase claims on cross-appeal from issuance of the writ on a Mills claim); Fretwell v. Norris, 133 F.3d 621, 623 (8th Cir. 1998) (dismissing cross-appeal where certificate of appealability denied); Williams v. Cain, 125 F.3d 269, 273 (5th Cir. 1997) (petitioner granted certificate of appealability on trial and sentencing phase claims on cross-appeal from grant of writ on capital sentencing claim); see also 16 Fed. Proc., L. Ed. S 41:528 (1999). The parties have not raised or briefed these issues. We need not, and do not, decide these issues, however, but will treat the cross-appeal as a request for certificate of appealability, and grant it, in view of the clear constitutional implications of the Witherspoon challenge.

31

were not consistently applied at the time of his 1981 trial, and thus there can be no procedural default for purposes of federal habeas review.

The Commonwealth is correct that the state court rejected the Witherspoon claims on procedural grounds. The Pennsylvania Supreme Court expressly held that, as to the six veniremen at issue, "the issue of whether[those] prospective jurors were improperly excluded under Witherspoon has been waived and cannot now be addressed for the first time on appeal." 484 A.2d at 1379. The court cited several of its prior (noncapital) cases and noted that it had "consistently found errors of constitutional dimension to have been waived." Id. It thus declined to reach the merits due to counsels' failure to raise the issue at the trial level.

A habeas court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman, 501 U.S. at 729. The Pennsylvania Supreme Court's procedural rules were independent of the Witherspoon claims, and thus we turn to whether the rules were "adequate to support the judgment." A procedural rule is adequate only if it is firmly established, readily ascertainable, and regularly followed. Ford v. Georgia, 498 U.S. 411, 423–24 (1991); Harris v. Reed, 489 U.S. 255, 262 (1989). In Doctor v. Walters, 96 F.3d 675 (3d Cir. 1996), we explained that a rule is adequate only under the following conditions: "(1) the state procedural rule speaks in unmistakable terms; (2) all appellate courts refused to review the petitioner's claims on the merits; and (3) the state courts' refusal in this instance is consistent with other decisions." Id. at 683–684; see also Dugger v. Adams, 489 U.S. 401, 410 n.6 (1989) (explaining that a state must demonstrate that in the "vast majority of cases" the rule is applied in a "consistent and regular" manner); Hathorn v. Lovorn, 457 U.S. 255, 263 (1982) (explaining that a state rule should be applied "evenhandedly to all similar claims"). "[T]hese conditions must have existed at the time of the state court procedural default." Cabrera v. Barbo, 175 F.3d 307, 313 (3d Cir. 1999). "The reason for these requirements

32

is that a petitioner should be on notice of how to present his claims in the state courts if his failure to present them is to bar him from advancing them in a federal court." Id.

Szuchon allegedly defaulted the Witherspoon claims at trial in 1981. At that time, and indeed to this day, the Pennsylvania Supreme Court has employed a doctrine of "relaxed waiver" whereby it will reach the merits of a claim on a direct appeal in a capital case even if the claim would otherwise be waived by the failure to raise it at the trial level. See, e.g., Commonwealth v. Rivera, 773 A.2d 131, 139 n.7 (Pa. 2001) ("Technically, this claim is waived because counsel failed to make a timely objection to the jury instruction. See Pa.R.Crim.P. 1119(b). However, because this is a capital case on direct appeal, we will nonetheless review the merits of this claim pursuant to the relaxed waiver rule.") (citations omitted). As the court explained in Commonwealth v. Albrecht, 720 A.2d 693 (Pa. 1998), "[r]elaxed waiver, as an operating principle, was created to prevent this court from being instrumental in an unconstitutional execution. Due to the unique severity and finality of the death penalty, this court has relaxed its waiver rules as to any claim raised on direct appeal for which the record permits review." Id. at 700 (citing Commonwealth v. McKenna, 383 A.2d 174 (Pa. 1978); Commonwealth v. Zettlemoyer, 454 A.2d 937 (Pa. 1982)).

McKenna, which was decided before Szuchon's trial, was the seminal case on relaxed waiver. There, the Pennsylvania Supreme Court noted its longstanding general rule that a claim is waived on appeal when not preserved, but the court decided to "make a particular limited exception to the general rule requiring that an issue first be considered in the court of common pleas," noting "the public interest in assuring that the death sentence is imposed only in a constitutionally permitted manner. . . ." 383 A.2d at 180 n.11. The court observed that, "because imposition of the death penalty is irrevocable in its finality, it is imperative that the standards by which that sentence is fixed be constitutionally beyond reproach." Id. at 181. The court explained that it had "a duty to transcend procedural rules which are not, in spirit, applicable, to the end that the public interest may be vindicated." Applying these relaxed

33

waiver principles, the court vacated a death sentence on the ground that the statute under which the defendant was sentenced was unconstitutional, even though the defendant had failed to preserve that issue. Id. at 179; see also Zettlemoyer, 454 A.2d at 942 n.3 (reaching the merits of claims that otherwise would have been waived and reaffirming the principle that " `imposition of the death penalty is irrevocable in its finality' and warrants, therefore, the relaxation of our waiver rules") (quoting McKenna, 383 A.2d at 181).

Here, the holding that Szuchon waived his Witherspoon claims by failing to raise them in the trial court is difficult to square with the Pennsylvania Supreme Court's relaxed waiver rule.16 Indeed, the state court's opinion on Szuchon's direct appeal is notable for its failure to offer any discussion of relaxed waiver or even to cite McKenna, which rather firmly established that a claim of constitutional error in a capital case would not be waived by a failure to preserve it. Moreover, not one of the cases that the Pennsylvania Supreme Court cited to support the waiver was a capital case, see Szuchon, 484 A.2d at 1379–80, even though the court had held in McKenna that it would relax its waiver rules for capital defendants. Szuchon , in fact, appears to be the first reported decision in which the Pennsylvania Supreme Court held that a Witherspoon claim was waived by counsel's failure to preserve it, and subsequent decisions have relied on Szuchon as the case that established that precedent. E.g., Commonwealth v. Lewis, 567 A.2d 1376, 1381 (Pa. 1989) ("Although waiver of any claim in a capital case appears to be contradictory to the relaxed waiver rules afforded these appellants through Zettlemoyer, the case law of this Commonwealth is clear. This Court has repeatedly held that Witherspoon claims are waivable.") (citing Commonwealth v. Peterkin , 513 A.2d 373 (Pa. 1986), and Szuchon). But such a precedent setting use of a procedural bar indicates that the bar was not firmly established, readily ascertainable, and regularly followed at

_____

16. Of course, the Mills claim, in contrast, was not waived at trial and later presented to the state supreme court; it was simply never raised at any level in the state courts. The relaxed waiver rule, therefore, has no application to the Mills claim.

34

the time of the purported default. See Reynolds v. Ellingsworth, 843 F.2d 712, 722 (3d Cir. 1988); see also Granviel v. Estelle, 655 F.2d 673, 679 (5th Cir. 1981) ("We cannot enforce against Granviel a contemporaneous [Witherspoon] objection rule that apparently did not even exist at the time of his trial.").

In short, the holding of a waiver on Szuchon's direct appeal was not "adequate to support the judgment" for purposes of a procedural default under federal habeas law. Accordingly, we will address the merits of the Witherspoon claims.

2. Exclusion of Prospective Jurors

The Court held in Witherspoon that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected." 391 U.S. at 522-23. Witherspoon 's holding is grounded in the right to a fair and impartial jury guaranteed to state criminal defendants by the Sixth and Fourteenth Amendments, and thus veniremen can be excluded based on their views on capital punishment only if they would be biased and lack impartiality in hearing the case. In Wainwright v. Witt, 469 U.S. 412 (1985), the Court held that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " Id. at 424 (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)).17 The Court explained that:

_____

17. In Adams, the Supreme Court had applied the same standard and held that it violated Witherspoon to "exclude jurors who stated that they would be `affected' by the possibility of the death penalty, but who apparently meant only that the potentially lethal consequences of their decision would invest their deliberations with greater seriousness and gravity or would involve them emotionally," 448 U.S. at 49, and that it also violated Witherspoon to exclude jurors"only because they were unable positively to state whether or not their deliberations would in any way be `affected.' " Id. at 50.

35

this standard . . . does not require that a juror's bias be proved with "unmistakable clarity" . . . because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.

Id. at 424-26 (footnote omitted).

The Court explained in Witt that "[a]s with any other trial situation where an adversary wishes to exclude a juror because of bias, . . . it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality." 469 U.S. at 423. Thus, when the state wishes to exclude a prospective juror for cause because of his or her views on the death penalty, it must question that juror to make a record of the bias. See Gray v. Mississippi, 481 U.S. 648, 652 n.3 (1987) ("A motion to excuse a venire member for cause of course must be supported by specified causes or reasons that demonstrate that, as a matter of law, the venire member is not qualified to serve.") (citation omitted).

After the state offers its challenge for cause,"[i]t is then the trial judge's duty to determine whether the challenge is proper." Witt, 469 U.S. at 423. Thus, before it can sustain the exclusion, the judge must make a factual determination that the prospective juror would be biased. On federal habeas review, that determination of bias is entitled to the presumption of correctness. Id. at 428. As the Court emphasized in Witt, a trial judge's "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record." Id. at 429; see also Deputy v. Taylor, 19 F.3d 1485, 1499

36

(3d Cir. 1994) ("The trial court is in the best position to observe the demeanor of the prospective jurors.").

The following colloquy was at issue in Witt:

> [Q. Prosecutor:] Now, let me ask you a question, ma'am. Do you have any religious beliefs or personal beliefs against the death penalty?
>
> [A:] I am afraid personally but not--
>
> [Q]: Speak up, please.
>
> [A]: I am afraid of being a little personal, but definitely not religious.
>
> [Q]: Now, would that interfere with you sitting as a juror in this case?
>
> [A]: I am afraid it would.
>
> [Q]: You are afraid it would?
>
> [A]: Yes, Sir.
>
> [Q]: Would it interfere with judging the guilt or innocence of the Defendant in this case?
>
> [A]: I think so.
>
> [Q]: You think it would.
>
> [A]: I think it would.
>
> [Q]: Your honor, I would move for cause at this point.
>
> [COURT:] All right. Step down.

469 U.S. at 415-16. Based on this exchange, the Supreme Court held that the judge's finding of bias, although not free of ambiguity, was fairly supported and therefore presumptively correct. The Court explained that the judge was not required "to announce for the record that[the prospective juror] was biased, or his reasoning," id. at 430, and added that, "[i]n this regard it is noteworthy that in this case the court was given no reason to think that elaboration was necessary; defense counsel did not see fit to object to [the] recusal, or attempt rehabilitation." Id. at 430-31. The Court noted that counsel's failure to speak was a circumstance that it would consider when assessing

37

respondent's belated claims that the situation was "so rife with ambiguity . . . as to constitute constitutional error." Id. at 431 n.11.

Under Witt, therefore, the proper inquiry on pre-AEDPA habeas review of a Witherspoon claim is whether there is fair support in the record for the judge's finding that the prospective juror's views on the death penalty would have prevented or substantially impaired the performance of his or her duties as a juror in accordance with the instructions and oath. We must factor the decision of Szuchon's counsel to state "no objection" to the exclusions into our assessment of the transcript.18 As noted, Szuchon takes issue with the exclusion of six prospective jurors, but we conclude that there is no need to address all six, as the improper exclusion of even one veniremen in violation of Witherspoon warrants relief. See Gray, 481 U.S. at 657-68 (holding that erroneous exclusion of one potential juror based on her views on the death penalty was reversible constitutional error); see also United States v. Chanthadara, 230 F.3d 1237, 1268 (10th Cir. 2000) ("Because the erroneous exclusion of even one potential juror mandates reversal of a death sentence, our analysis takes us no further than potential juror Joy Phillips."); Fuller v. Johnson, 114 F.3d 491, 500 (5th Cir. 1997) ("Where the court finds that even one juror was improperly excluded, the defendant is entitled to a new sentencing, because the right to an impartial adjudication is `so basic to a fair trial that [its] infraction can never be treated as harmless error.' ") (quoting Gray, 481 U.S. at 668). We will focus, therefore, solely on the exclusion of Floyd Rexford. The relevant portion of Rexford's voir dire is as follows:

> [Prosecutor]: If the evidence were to establish, sir, a case of first degree murder, in other words, the type of case that would show that Mr. Szuchon shot and killed that woman intentionally, that he did it with malice and that he did it with premeditation and those are the

_____

18. Szuchon also raises a claim that counsel were ineffective in failing to object to each prospective juror's exclusion or to attempt rehabilitation. Because we find a violation of Witherspoon per se, we need not reach the ineffectiveness claim.

elements of first degree murder, would you have any
conscientious scruple or any hesitation to find him
guilty of first degree murder?

[A]: I do not believe in capital punishment.

[Q]: You do not believe in capital punishment?

[A]: No.

[Q]: I challenge for cause, your Honor.

[Defense Counsel]: No objection.

[Prosecutor]: Thank you, Mr. Rexford.

[Court]: Thank you Mr. Rexford . . . .

App. 2116.

This limited questioning provided no evidence that
Rexford's lack of belief in capital punishment would have
prevented or substantially impaired his ability to apply the
law. As the Court emphasized in Adams v. Texas , "it is
clear beyond peradventure that Witherspoon is not a
ground for challenging any prospective juror. It is rather a
limitation on the State's power to exclude: if prospective
jurors are barred from jury service because of their views
about capital punishment on `any broader basis' than
inability to follow the law or abide by their oaths, the death
sentence cannot be carried out." 448 U.S. at 47–48.
Rexford's mere lack of a belief in capital punishment was a
"broader basis" for exclusion than inability to follow the
law. Indeed, "those who firmly believe that the death
penalty is unjust may nevertheless serve as jurors in
capital cases so long as they state clearly that they are
willing to temporarily set aside their own beliefs in
deference to the rule of law." Lockhart v. McCree, 476 U.S.
162, 176 (1986). Neither the Commonwealth nor the trial
court, however, questioned Rexford about his ability to set
aside his beliefs or otherwise perform his duty as a juror.
As a result, there was no evidence or even a suggestion that
Rexford would act in a biased fashion due to his lack of
belief in capital punishment, and the trial court, therefore,
failed in its duty to determine that there was a proper basis
for the exclusion. Cf. Gall v. Parker, 231 F.3d 265, 330–32
(6th Cir. 2001) (holding that exclusion violated Witherspoon

39

because "[n]otwithstanding the deference owed to the trial judge, we find that the factual record does not fairly support [the prospective juror's] exclusion under the standards of Adams and Witt";"[the prospective juror] not once stated that his beliefs would deter him from serving as an impartial juror"). Thus, while we begin with the presumption that the trial court's determination of bias is correct, that presumption cannot adhere in the absence of record support for the exclusions.

Our precedents are not to the contrary. In Lesko v. Lehman, 925 F.2d 1527 (3d Cir. 1991), for example, the prospective juror "initially stated to the prosecutor that she would be willing to vote for the death penalty in a proper case," id. at 1548, but "provided an ambiguous response to defense counsel's query about whether `irrespective of the evidence' she would `vote automatically for the death penalty' for a defendant convicted of murdering a police officer." Id. The judge then queried the prospective juror, and she "responded affirmatively to the court's inquiry about whether `under all circumstances' and `irrespective of [the] evidence' her opposition to capital punishment would prevent her from participating in a decision to impose the death penalty." Id. Under those circumstances, we held that the judge did not err in excluding the prospective juror because the "statements on voir dire establish[ed] a likelihood that her opposition to capital punishment would have substantially impaired her ability to comply with the trial court's sentencing instructions." Id.  Here, in contrast, no reasonable inference can be drawn that Rexford's lack of belief in capital punishment would have prevented or impaired his ability to follow the court's sentencing instructions. Even affording the trial court the deference it is owed in its assessment of Rexford's credibility and demeanor, and even accepting that juror bias need not be proved with "unmistakable clarity," the determination of bias in this case is unsupported.

The District Court concluded that the six exclusions (including Rexford's) were proper under Witt because "in each instance, the prospective juror was unable to look past the possible imposition of the death penalty to answer the specific question posed and each of the prospective

40

jurors expressed unwillingness to sentence this defendant to die for the crime of first degree murder." We find no support in the record for this conclusion. The question posed did not probe willingness to vote in a certain way, but, rather, sought out any scruples or hesitation. Rexford apparently interpreted the question as seeking his views and, in responsive fashion, he noted his lack of belief.19 At that point, Rexford's views on the death penalty became the

_____

19. The five other veniremen at issue -- Chalupczynski, Buczek, Howard, Dobruk, and Settino -- likewise seemed to believe the question sought their views on the death penalty. Katherine Buczek's voir dire, for example, was as follows:

[Prosecutor]: If the evidence were to establish a case of first degree
    murder, . . . if you found that and the evidence justified that
    finding, would you have any conscientious scruple, any moral belief
    or any hesitation against finding him guilty of first degree
murder?

[A]: I have to ask a question.

[Q]: Go ahead.

[A]: Does that involve capital punishment?

[Q]: Yes, that is my next question.

[A]: Because I so indicated on the questionnaire that I received
    concerning jury duty that I was opposed to capital punishment.

[Q]: Okay. I believe that I knew that also, and that is where I was
    headed for with that question. You are opposed to capital
    punishment, ma'am?

[A]: Yes, and I have been actively opposed to it in circulating
    petitions.

[Q]: Okay.

[A]: And things of that nature.

[Q]: In connection with the NAACP Legal Defense Fund?

[A]: Right.

[Q]: I challenge for cause, your Honor.

[Defense counsel]: No objection.

[Court]: Thank you, ma'am.

App. 1892-93 (emphasis added).

41

issue, and the prosecutor asked, "You do not believe in the death penalty?" Rexford simply replied "no," and the prosecutor moved to exclude him. The prosecutor failed, however, to meet his burden under Witt of asking even a limited number of follow-up questions to show that Rexford's views would render him biased. Thus, the only supportable inference on this record is that Rexford was excluded because he voiced opposition to the death penalty. Rexford also did not "express unwillingness" to impose the death penalty. He merely stated that he did not"believe" in capital punishment, which is by no means the equivalent of being unwilling to impose it. Again, even those firmly opposed to the death penalty can serve as jurors if they are "willing to temporarily set aside their own beliefs in deference to the rule of law." Lockhart, 476 U.S. at 176.

In short, Rexford's exclusion violated Szuchon's rights under Witherspoon. It is settled that a Witherspoon violation is not subject to harmless error analysis. Gray , 481 U.S. at 668; Davis v. Georgia, 429 U.S. 122, 123 (1976). It is of no moment, therefore, that the Commonwealth had seven unused peremptory challenges with which it could have struck the six prospective jurors. See Gray, 481 U.S. at 664 (rejecting the argument that "a Witherspoon  violation constitutes harmless error when the prosecutor has an unexercised peremptory challenge that he states he would have used to excuse the juror"). The relief that must be afforded is a new sentencing proceeding. Witherspoon, 391 U.S. at 523 n.21; see Fuller, 114 F.3d at 500. Accordingly, we will affirm, on alternative grounds, the District Court's decision to grant the writ.

V. CONCLUSION

To summarize, we will DENY a certificate of appealability on all claims of trial error other than the Estelle claims; we will AFFIRM the District Court's denial of relief on the Estelle claims; the Mills claim is procedurally defaulted, but we will AFFIRM, on the basis of Witherspoon, the District Court's issuance of the writ conditioned upon the Commonwealth's right to conduct a new sentencing

42

proceeding within 120 days or impose a sentence of life imprisonment.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

43